[No. 49493-2. En Banc. June 19, 1986.]

THE STATE OF WASHINGTON, *Respondent,* v. ROBERT WAYNE HUGHES, *Appellant.*

*Robert Wayne Hughes,* pro se, and *Paris K. Kallas, Nancy L. Talner,* and *Raymond H. Thoenig* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Deborah J. Phillips, Senior Appellate Attorney,* for respondent.

ANDERSEN, J.—

## FACTS OF CASE

The defendant, Robert Wayne Hughes, appeals his conviction of aggravated murder in the first degree and the sentence of life imprisonment without possibility of parole which followed.

On June 17, 1982, one John Early was shot and killed in his home during an apparent robbery. A King County police officer, Sergeant Samuel Hicks, soon suspected that the defendant was involved in the murder. He requested assistance in the Early investigation, and King County Detective Leo Hursh tracked down the address of the defendant's girl friend. The two of them then drove to her home in rural south King County on the morning of June 24. They wore street clothes and drove an unmarked Camaro automobile.

The two officers drove by the residence where they saw the defendant getting into a pickup truck. The officers then drove to a nearby residence and phoned for additional support. When they emerged, they saw the pickup truck driving off. They followed the pickup for about 2 miles and noticed that its three passengers were looking back at them. (The defendant's companions were later identified as his brother and his girl friend's son.) The officers followed the pickup until it pulled into the driveway of a dairy farm adjacent to the Flaming Geyser State Park. The officers got out of the Camaro with their guns drawn, announced they were police and ordered the truck ignition turned off. The defendant denied hearing that announcement. A 7-minute gun battle ensued, during which the defendant shot and

killed the police sergeant and wounded the detective.

On June 29, 1982, the King County Prosecuting Attorney charged the defendant with aggravated murder in the first degree and assault in the first degree. The prosecutor filed a notice of intent to seek the death penalty on the same day. On July 7, the information was amended to also charge the defendant with the first degree felony murder of John Early.

The two murder cases were set to be tried together. When the trial court denied a motion to sever, the defendant pleaded guilty to the Early murder. The defendant later testified that he shot the officers in self–defense, thinking that the two had a contract on his life because of a drug deal. He denied knowing they were police officers.

The jury found the defendant guilty of aggravated murder in the first degree and assault in the first degree, but was unable to agree on whether mitigating circumstances merited leniency. Accordingly, the trial court sentenced the defendant to life without possibility of parole for the police sergeant's murder. Separate life sentences were imposed based on the assault of the detective and the prior murder of John Early.

The defendant appealed his conviction, and we accepted direct review.

Eight basic issues are presented.

## ISSUES

ISSUE ONE. Is the procedure of "death qualifying" a jury in a capital case unconstitutional?

ISSUE TWO. Did the trial court err in refusing to give the defendant's proposed instruction on "imperfect" self–defense?

ISSUE THREE. Did the trial court err in giving an "aggressor/provoker" jury instruction?

ISSUE FOUR. Was the defendant denied a fair trial because of prosecutorial misconduct?

ISSUE FIVE. Is the defendant's conviction unconstitutional because the jury was not instructed to find that the

defendant knew the victim was performing his official duties at the time of the murder?

ISSUE SIX. Did the State fail to present sufficient evidence on the issue of whether the defendant committed premeditated murder?

ISSUE SEVEN. Did the trial court err in admitting statements made by the defendant after he was jailed?

ISSUE EIGHT. Did the mandatory statutory sentence of life imprisonment without parole, entered on the charge of murdering the police sergeant, amount to an unconstitutional restriction of the judiciary's sentencing power?

## DECISION

ISSUE ONE.

CONCLUSION. The quest in this case, as elsewhere, is for jurors who will conscientiously apply the law and find the facts. In a capital case, the death qualification process during voir dire examination ensures that the law is upheld and interferes with neither party's right to a fair trial; it is not unconstitutional.

By pretrial motion, the defendant sought to preclude the court from death qualifying the jury. In this connection, we observe parenthetically that "death qualification" is the process whereby prospective jurors are asked about the death penalty and excluded from the final panel if they oppose it.[1] In support of his motion, the defendant submitted several studies regarding the effects of death qualification on prospective jurors. After considering these materials, the trial court denied the defendant's motion to preclude voir dire questioning on capital punishment and to prevent the removal for cause of "anti–death penalty" jurors.

Thus, both attorneys were permitted to question prospective jurors concerning their views on capital punishment. The trial judge also asked questions concerning this. The prospective jurors were questioned individually and

---

[1] *See* Note, *The Battle Over the Standards for Death–Qualifying Juries: Defendants Lose Another Round*, 61 Chi.–Kent L. Rev. 611 (1985).

were cautioned by the court to not discuss their voir dire examination with anyone else. Four prospective jurors were challenged for cause and discharged because of their death penalty views. One, a Christian pastor, was excused because of his total opposition toward the death penalty. Another was excused because she apparently too strongly favored imposing the death penalty. Two others were excused because they strongly opposed capital punishment and either stated or implied that their opposition might affect their ability to determine guilt or innocence.

The United States Supreme Court has consistently upheld the procedure of death qualifying a jury in a capital case.[2] Thus, a prospective juror may appropriately be questioned about the death penalty and may then be challenged for cause if the juror's views on capital punishment would "'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'"[3]

Both the premise of death qualification and the actual exclusion of jurors because of their views on capital punishment have similarly been upheld by this court.[4] Washington courts will exclude not only those jurors who will never vote for the death penalty at the one extreme, but also those who will automatically impose it at the other.[5]

█ Until recently, neither this court nor the United States Supreme Court had definitively answered the ques-

---

[2]See Lockhart v. McCree, ___ U.S. ___, 90 L. Ed. 2d 137, 106 S. Ct. 1758 (1986); Wainwright v. Witt, 469 U.S. 412, 83 L. Ed. 2d 841, 105 S. Ct. 844 (1985); Adams v. Texas, 448 U.S. 38, 65 L. Ed. 2d 581, 100 S. Ct. 2521 (1980); Witherspoon v. Illinois, 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, reh'g denied, 393 U.S. 898, 21 L. Ed. 2d 186, 89 S. Ct. 67 (1968).

[3]Wainwright, at 424.

[4]See State v. Mak, 105 Wn.2d 692, 705, 718 P.2d 407 (1986); State v. Jeffries, 105 Wn.2d 398, 410–12, 717 P.2d 722 (1986); State v. Rupe, 101 Wn.2d 664, 694–97, 683 P.2d 571 (1984).

[5]See State v. Mak, supra; State v. Peyton, 29 Wn. App. 701, 708–09, 630 P.2d 1362 (1981).

tion presented here: whether the process of death qualifying prospective jurors in a capital case makes the final panel prosecution prone. The question was raised in *Witherspoon v. Illinois,* 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, *reh'g denied,* 393 U.S. 898, 21 L. Ed. 2d 186, 89 S. Ct. 67 (1968), but was left unanswered because the Court decided that the literature on the subject was "too tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in the determination of guilt."[6]

The California Supreme Court undertook one of the first comprehensive surveys of death qualification literature in *Hovey v. Superior Court,* 28 Cal. 3d 1, 616 P.2d 1301, 168 Cal. Rptr. 128 (1980). It concluded that California death qualified jurors were not so prosecution prone as to violate the constitutional demands of jury neutrality. This was because California excluded not only "anti–death penalty" jurors but "automatic death penalty" jurors as well.[7] The exclusion of "automatic" jurors had not been considered in the studies surveyed in *Hovey.*[8]

The defendant herein sought to rehabilitate the *Hovey* materials with new studies indicating that the automatic death penalty group is so small as to be statistically insignificant. The defendant also sought to establish that questioning jurors about the death penalty desensitizes them and makes them more prone to convict. On appeal, the defendant relied chiefly on the Eighth Circuit's decision in *Grigsby v. Mabry,* 758 F.2d 226 (8th Cir. 1985), *rev'd sub nom. Lockhart v. McCree,* ___ U.S. ___, 90 L. Ed. 2d 137, 106 S. Ct. 1758 (1986). The *Grigsby* majority reviewed much of the available literature and concluded that death

---

[6]*Witherspoon,* 391 U.S. at 517–18.

[7]*Hovey v. Superior Court,* 28 Cal. 3d 1, 8–9, 616 P.2d 1301, 168 Cal. Rptr. 128 (1980).

[8]*Hovey,* at 63.

qualified juries are conviction prone.[9] The United States Supreme Court reviewed similar studies and doubted that they proved that death qualified juries are prosecution prone.[10] Even assuming that the literature so proved, however, the Court upheld as constitutional the process whereby death–opposed jurors are excluded from a jury in a capital case.[11]

The Supreme Court first analyzed the major issue in *Grigsby* and one of the arguments the defendant raises here: whether an impartial jury can exist when a distinct group in the community is excluded by systematically challenging them for cause.[12]

The Sixth and Fourteenth Amendments guarantee a defendant a jury that is representative of the community.[13] "[V]enires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof."[14] The *Grigsby* majority found that anti–death penalty jurors constitute a distinct group whose exclusion violates a defendant's Sixth Amendment rights.[15]

The United States Supreme Court disagreed, holding that groups defined solely in terms of shared attitudes that would prevent or substantially impair members of the group from performing one of their duties as jurors, are

---

[9]*Grigsby v. Mabry,* 758 F.2d 226, 229 (8th Cir. 1985), *rev'd sub nom. Lockhart v. McCree,* ___ U.S. ___, 90 L. Ed. 2d 137, 106 S. Ct. 1758 (1986).

[10]*Lockhart,* 106 S. Ct. at 1762–63.

[11]*Lockhart,* 106 S. Ct. at 1764.

[12]*See Grigsby,* at 241–42.

[13]*See Taylor v. Louisiana,* 419 U.S. 522, 538, 42 L. Ed. 2d 690, 95 S. Ct. 692 (1975).

[14]*Taylor,* 419 U.S. at 538.

[15]*Grigsby,* at 231.

not distinctive groups for Sixth Amendment purposes.[16] The Court observed that unlike groups such as women, blacks, or Mexican–Americans, death–opposed jurors are excluded on the basis of an attribute within the individual's control.[17] "They are treated no differently than any juror who expresses the view that he would be unable to follow the law in a particular case."[18] This observation echoes one made by the Fourth Circuit: "Although the right to a jury trial includes the right to a jury venire drawn from a representative cross–section of the community, it does not include the right to be tried by jurors who are unable or unwilling to follow the law and the instructions of the trial judge in a capital case."[19]

The same concern prompted the Fifth Circuit to dismiss the Sixth Amendment argument.[20] It observed:

> The fair cross–section must, in the end, be fair. Neither the state nor the defendant is entitled to an unfair juror whose interests, biases or prejudices will determine his or her resolution of the issues regardless of the law and regardless of the facts. A cross–section of the fair and impartial is more desirable than a fair cross–section of the prejudiced and biased.

*Smith v. Balkcom,* 660 F.2d 573, 583 (5th Cir. 1981), *modified on other grounds,* 671 F.2d 858 (5th Cir.), *cert. denied,* 459 U.S. 882, 74 L. Ed. 2d 148, 103 S. Ct. 181 (1982).

We concur with the foregoing analyses. Furthermore, even if jurors opposed to the death penalty could be held to constitute a distinct group or cognizable class, their exclu-

---

[16]*Lockhart,* 106 S. Ct. at 1765.

[17]*Lockhart,* 106 S. Ct. at 1766.

[18]*Lockhart,* 106 S. Ct. at 1766.

[19]*Keeten v. Garrison,* 742 F.2d 129, 133 (4th Cir. 1984); *see also Lockett v. Ohio,* 438 U.S. 586, 596–97, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978).

[20]*Smith v. Balkcom,* 660 F.2d 573, 582 (5th Cir. 1981), *modified on other grounds,* 671 F.2d 858 (5th Cir.), *cert. denied,* 459 U.S. 882, 74 L. Ed. 2d 148, 103 S. Ct. 181 (1982).

sion from a jury panel is justified if their attitudes would prevent them from following the law and the trial court's instructions in a capital case.

The defendant also argues that a death qualified jury violates his right to due process. This argument arises from his claim that questioning jurors about the death penalty desensitizes them to the idea of eventually imposing it. We have analyzed this contention in two previous cases, *State v. Jeffries*, 105 Wn.2d 398, 717 P.2d 722 (1986) and *State v. Rupe*, 101 Wn.2d 664, 683 P.2d 571 (1984). In both, the separate and individual questioning of jurors by court and counsel led us to conclude that "the possibility of tainting the jury is so minimal that the procedures satisfy due process."[21] Each prospective juror in the case at bar was questioned alone and cautioned not to speak about the voir dire process to anyone else. The defendant's due process rights were not violated.

Tied to the defendant's due process argument is his further claim that the death qualification procedure deprived him of an impartial jury. The State as well as the accused has the right to an impartial jury.[22] Impartiality requires not only freedom from jury bias against the accused and for the prosecution, but freedom from jury bias for the accused and against the prosecution.[23] The voir dire process is designed to cull from the venire persons who demonstrate that they cannot be fair to either side of the case.

> The guarantee of impartiality cannot mean that the state has a right to present its case to the jury *most* likely to return a verdict of guilt, nor can it mean that the accused has a right to present his case to the jury *most* likely to acquit. But the converse is also true. The guarantee cannot mean that the state must present its case to the jury

---

[21]*Jeffries*, at 412, quoting with approval *Rupe*, at 697.

[22]*See Hayes v. Missouri*, 120 U.S. 68, 70–71, 30 L. Ed. 578, 7 S. Ct. 350 (1887).

[23]*Spinkellink v. Wainwright*, 578 F.2d 582, 596 (5th Cir. 1978), *cert. denied*, 440 U.S. 976, 59 L. Ed. 2d 796, 99 S. Ct. 1548 (1979).

*least* likely to convict or impose the death penalty, nor that the defense must present its case to the jury *least* likely to find him innocent or vote for life imprisonment.

. . .

. . . The logical converse of the proposition that death–qualified jurors are conviction prone is that non-death–qualified jurors are acquittal prone, not that they are neutral.

*Smith,* 660 F.2d at 579.[24]

The United States Supreme Court similarly declined to conclude that jurors who can be fair to both sides of a case are not impartial.

[T]he Constitution presupposes that a jury selected from a fair cross–section of the community is impartial, regardless of the mix of individual viewpoints actually represented on the jury, so long as the jurors can conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case.

*Lockhart,* 106 S. Ct. at 1770. We thus decline, as did the Fifth Circuit, to define "impartial" as "a middle ground that involves a jury with persons who are in effect defendant prone."[25]

Even were we to assume that death qualified jurors are somehow prosecution prone, the remedy for any such problem is unclear. The defendant's view is that allowing only peremptory challenges of anti–death penalty jurors, rather than challenges for cause, will solve the problem. He does not reveal how the prosecution is to discover such jurors without questioning them about capital punishment. Moreover, in the absence of such questioning, it is by no means clear how the defense will discover whom to challenge because of pro–death penalty views.

It has been urged that a system be adopted whereby separate juries would sit during the guilt and sentencing phases, with only the sentencing jury being "death quali-

---

[24]*See Keeten,* 742 F.2d at 134; *Foster v. State,* 304 Md. 439, 463, 499 A.2d 1236 (1985). *See also Spinkellink,* 578 F.2d at 596.

[25]*See Smith,* 660 F.2d at 579.

fied". This is not possible in Washington because a state statute mandates that a single jury, under all but unforeseeable circumstances, decides both guilt and sentence.[26] The 2–jury system is disfavored for other reasons. Jurors may harbor what one court has referred to as "whimsical doubts" in the guilt phase that might prevent them from voting for the death penalty in the sentencing phase.[27] If a new jury sits in the sentencing phase, it will harbor no such doubts and may be more likely to vote for the death penalty.[28]

The *Grigsby* majority also discussed selecting alternate jurors to replace anti–death penalty jurors (as revealed by voir dire questioning) after the guilt phase.[29] One obvious problem with such a system was voiced in *People v. Fields,* 35 Cal. 3d 329, 673 P.2d 680, 197 Cal. Rptr. 803 (1983), *cert. denied,* 469 U.S. 892, 83 L. Ed. 2d 204, 105 S. Ct. 267 (1984):

> [The alternate] would be joining a group which has already discussed and evaluated the circumstances of the crime, the capacity of the defendant, and other issues which bear both on guilt and on penalty. The resulting deliberations between old members . . . and new members ignorant of those discussions and conclusions, would depart from the requirement that jurors "reach their consensus through deliberations which are the common experience of all of them."

(Footnote and citation omitted.) *Fields,* 35 Cal. 3d at 351.

Another problem with both the proposed 2–jury and alternate systems would be that an opponent of capital punishment sitting in the guilt phase might be driven by conscience to acquit even when guilt beyond a reasonable

---

[26]RCW 10.95.050; *State v. Mak,* 105 Wn.2d 692, 721, 718 P.2d 407 (1986).

[27]*Smith,* 660 F.2d at 580.

[28]*Smith,* 660 F.2d at 581.

[29]*See Grigsby v. Mabry,* 758 F.2d 226, 243 (8th Cir. 1985), *rev'd sub nom. Lockhart v. McCree,* ___ U.S. ___, 90 L. Ed. 2d 137, 106 S. Ct. 1758 (1986).

doubt was proven. Such a vote would thereby "hang" the guilt–innocence jury.[30] An additional problem with both ideas for "shuffling jurors in and out of the jury box" is the separation of certain jurors' responsibility for the verdict from their responsibility for the penalty. "The two must go hand in hand, else the common law jury system no longer exists."[31]

We conclude that the process of death qualifying a jury in accordance with the law and practice of this State ensures that the jurors selected will uphold the law and does not interfere with either party's right to a fair trial. The process does not result in a jury that is unrepresentative of the community and is not violative of either the state or federal constitution.[32] In the case before us, error was not committed, constitutional or otherwise, in the jury selection process.

ISSUE TWO.

CONCLUSION. Washington law does not lessen criminal culpability because someone acts in self–defense based on an honest but unreasonable belief. We decline to adopt the doctrine of so–called "imperfect" self–defense.

The defendant excepted to the trial court's refusal to give his following proposed instruction on imperfect self–defense:

The use of force is not done with unlawful intent to kill where the person believes in good faith that he or she is acting in self defense even though the person's belief is unreasonable.

The defendant does *not* contend that the self–defense instruction given by the trial court was erroneous in any respect, so far as it goes. That instruction required that a defendant's belief in the need to defend himself must be

---

[30]*Keeten,* 742 F.2d at 133; *Spinkellink,* 578 F.2d at 595.

[31]*Rector v. State,* 280 Ark. 385, 396, 659 S.W.2d 168 (1983), *cert. denied,* 466 U.S. 988, 80 L. Ed. 2d 842, 104 S. Ct. 2370 (1984).

[32]U.S. Const. amends. 6, 14; Const. art. 1, § 3; Const. art. 1, § 22 (amend. 10).

considered, but also required that such belief be reasonable.

If the defendant believed in good faith and on reasonable grounds that he was in danger of great bodily harm, he would have a right to resort to self defense. His conduct is to be judged by the conditions as they appeared to him at the time, not by conditions as they might now appear to the jury in light of the testimony before it.

Instruction 32 (part).

■ Under Washington case law, the justification of self–defense must be evaluated from the defendant's point of view as conditions appeared to him or her at the time of the act.[33] Self–defense in this state includes the "essential element" that the person using the force must reasonably believe that he or she is in danger.[34] The doctrine of imperfect self–defense would omit the latter essential element and require only a "good faith" or honest belief on the part of the killer that his or her actions were necessary for his or her safety. Such a belief would not exonerate a defendant; rather, because the element of malice is thereby removed, it would reduce a murder charge to manslaughter.[35]

Narrow statutory definitions of manslaughter have made adoption of imperfect self–defense difficult in some states.[36] As one commentator observes, "[i]n those states, however, which do not define voluntary manslaughter by statute, it would be easier to open up the crime to include other homicides." (Footnote omitted.)[37]

But Washington does define manslaughter by statute, and it does so in terms of the actor's state of mind regard-

---

[33]See State v. Allery, 101 Wn.2d 591, 594, 682 P.2d 312 (1984); State v. Painter, 27 Wn. App. 708, 711–12, 620 P.2d 1001 (1980).

[34]Painter, at 712; RCW 9A.16.050(1); see also RCW 9A.16.020(3).

[35]See State v. Faulkner, 301 Md. 482, 486, 483 A.2d 759 (1984); People v. Flannel, 25 Cal. 3d 668, 680, 603 P.2d 1, 160 Cal. Rptr. 84 (1979).

[36]See Hill v. State, 98 Nev. 295, 297, 647 P.2d 370 (1982); W. LaFave & A. Scott, Jr., Criminal Law § 77, at 583 (1972).

[37]LaFave, at 583.

ing the amount of force used.[38] A person commits manslaughter in the first degree by recklessly causing another's death.[39] Someone acts recklessly by knowing of and disregarding a substantial risk that a wrongful act may occur when such disregard is a gross deviation from reasonable conduct.[40] Manslaughter in the second degree is committed when someone with criminal negligence causes another's death.[41] Criminal negligence occurs when a reasonable person would realize the presence of a substantial risk of harm.[42]

In the case at bar, the trial court also instructed the jury on the elements of both first and second degree manslaughter as lesser included offenses. Therefore, while not in the form that the defendant desired, the jury did have before it for consideration whether the defendant's subjective beliefs, though unreasonable, merited his conviction of a lesser offense.

The statutory definitions of self–defense and manslaughter in Washington provide no room for the theory advocated by the defendant that an honest (or good faith) but unreasonable belief that self–defense is necessary merits leniency.[43] Washington law does, however, permit consideration of a defendant's state of mind. If a defendant subjectively thinks that self–defense is necessary and if that belief is reasonable, his or her use of force may be justified.[44] If a defendant is aware that his or her acts create a risk of seri-

---

[38]See State v. Jones, 95 Wn.2d 616, 623, 628 P.2d 472 (1981); State v. Sill, 47 Wn.2d 647, 651, 289 P.2d 720 (1955).

[39]RCW 9A.32.060(1)(a).

[40]RCW 9A.08.010(1)(c).

[41]RCW 9A.32.070(1).

[42]RCW 9A.08.010(1)(d).

[43]State v. Hatley, 41 Wn. App. 789, 798, 706 P.2d 1083 (1985).

[44]See State v. Wanrow, 88 Wn.2d 221, 233–36, 559 P.2d 548 (1977).

ous harm, but unreasonably disregards that risk, then the defendant can be found guilty of manslaughter instead of murder.[45]

The trial court correctly refused to instruct the jury on the doctrine of imperfect self–defense.

ISSUE THREE.

CONCLUSION. The aggressor/provoker instruction was properly given to the jury since there was evidence that the defendant shot first when the officers attempted to arrest him.

At trial, the defendant excepted to the following pattern jury instruction[46] given by the trial court on the ground that it was not supported by the evidence:

> No person may by any unlawful act create a necessity for acting in self–defense and thereupon kill or use force upon or toward another person. Therefore, if you find beyond a reasonable doubt the defendant was the aggressor and that defendant's acts and conduct provoked or commenced the fight, then self–defense is not available as a defense.

Instruction 33.

■ Each side is entitled to have the trial court instruct upon its theory of the case if there is evidence to support the theory.[47] On the other hand, it is prejudicial error to submit an issue to the jury when there is not substantial evidence concerning it.[48] An aggressor/provoker instruction was also at issue in *State v. Heath,* 35 Wn. App. 269, 666 P.2d 922 (1983). It was there held that since there was conflicting evidence as to whether the defendant's conduct or the victim's blows precipitated the fight, the aggressor/

---

[45]*See State v. Parr,* 93 Wn.2d 95, 97, 606 P.2d 263 (1980).

[46]WPIC 16.04 (rev.).

[47]*State v. Theroff,* 95 Wn.2d 385, 389, 622 P.2d 1240 (1980); *State v. Dana,* 73 Wn.2d 533, 536, 439 P.2d 403 (1968).

[48]*Albin v. National Bank of Commerce,* 60 Wn.2d 745, 754, 375 P.2d 487 (1962); *State v. Heath,* 35 Wn. App. 269, 271–72, 666 P.2d 922 (1983).

provoker instruction was properly given.[49]

The defendant argues that since the officers drew their guns first, they were the provokers of the resulting gunfire. At trial, however, the defense did not contend that the police acted improperly. The use of force is lawful whenever necessarily used by police officers in the performance of their legal duty.[50] The officers were investigating the defendant in connection with a murder and had a warrant for his arrest. They were justified in drawing their guns in connection with making the arrest.

The aggressor/provoker issue thus turns on who fired the first shot, and whether it was justified. Both of the defendant's companions said that they heard the officers identify themselves as police, though one later said he was not sure what he heard. The surviving officer testified that the defendant fired the first shot after the officers identified themselves and before there had been any shooting. Two other eyewitnesses were uncertain as to who fired first. Thus, there was credible evidence from which the jury could reasonably have concluded that it was the defendant who by shooting first provoked the gun battle. The trial court properly gave the aggressor/provoker jury instruction.

The claimed additional defects that the defendant now raises with respect to the aggressor/provoker instruction do not warrant a second trial. He argues that the use of the word "unlawful" to modify "act" makes the instruction too vague to guide the jury in the proper application of the law. This contention is not well taken.

The word "unlawful" was inserted in other instructions given to the jury at the defendant's request, and the defendant made no exception to the inclusion of that word in the aggressor/provoker instruction. This strongly suggests that experienced trial defense counsel considered the word "unlawful" helpful to the defendant's theory of the

---

[49]*Heath,* at 271–72.

[50]RCW 9A.16.020(1).

case at trial or, at least, not harmful.

This is also not a case where the defendant's acts could be deemed accidental, as was the situation in *State v. Arthur*, 42 Wn. App. 120, 708 P.2d 1230 (1985). In the present case, the jury's attention was directed to the defendant's intentional acts (shooting at two policemen) that allegedly provoked the victim's response (shooting back). While these acts were not specified in instruction 33, the evidence of unlawful conduct was clear. Any denial of the self–defense theory caused by the trial court's failure to sua sponte define "unlawful act" in this instruction could not be considered irrational, unreasonable or unfair in any event.

The defendant further argues that the aggressor/provoker instruction constituted an unlawful comment on the evidence in violation of Const. art. 4, § 16. That constitutional provision prohibits a judge from conveying to the jury his or her personal belief in the merits of the cause or some issue therein.[51] An instruction does not constitute an impermissible comment on the evidence when there is sufficient evidence in the record to support it and when the instruction is an accurate statement of the law.[52] The defense does not contend that the instruction inaccurately states the law. As pointed out above, evidence in the record supports the instruction. The aggressor/provoker instruction did not violate Const. art. 4, § 16.[53]

ISSUE FOUR.

CONCLUSION. There was no prejudicial prosecutorial misconduct; the evidence that the deputy prosecuting attorney referred to in opening statement and closing argument at trial had been admitted and the deputy prosecutor's objection here complained of was not outside the bounds of

---

[51]*Theroff*, at 389.

[52]*See Theroff*, at 389; *State v. Sampson*, 40 Wn. App. 594, 600, 699 P.2d 1253 (1985).

[53]*See Sampson*, at 599–600.

advocacy.

The defendant initially objects to references made to the murder of John Early in the deputy prosecutor's opening statement and closing argument.

By pretrial order, the trial court ruled that the defendant's statement on plea of guilty and some statements he made to his girl friend would be the only admissible references to the Early murder. In the defendant's statement on plea of guilty he said, "On June 17, 1982, I fired a shot which killed John Timothy Early, a human being, during the course of an attempt I made to rob him. During the commission of the offense I was armed with a deadly weapon which was a firearm. This offense occurred in King County. By 'rob' I mean to take property of another by use of force or threatened use of force." The defendant's girl friend testified that on the day of the Early murder, the defendant told her that he'd done "the worst thing." He said he knew he'd hang, but added, "If the cops ever come get me, I'll get them." The defendant also threatened to "blow her head off" if his girl friend told anyone about the murder.

The deputy prosecutor first referred to the Early murder during the State's opening statement to the jury.

[Deputy prosecutor:] . . . The evidence will show that prior to the slaying of Sergeant Hicks and the wounding of Detective Hursh that the defendant just seven days earlier had contemplated the robbery of one John Timothy Early. You will learn that in the late evening of June 17, 1982, the defendant accomplished it. The motive for the robbery, the evidence will show, was as simple as it was cold, and that is to get personal property belonging to the victim, John Timothy Early. Accordingly, the defendant armed himself with a rifle by which to accomplish his intended mission. The defendant Hughes confronted Early. He pointed the rifle and—

[Defense attorney:] Your Honor, I'm going to object at this time. I believe that's beyond the scope of proper opening.

THE COURT: Sustained.

[Deputy prosecutor:] You will not hear any further

facts surrounding the robbery–murder of John Timothy Early.

[Defense attorney:] Objection, your Honor.

THE COURT: Sustained.

The defense also objected to these references to the Early murder contained in the deputy prosecutor's closing argument:

[Deputy prosecutor:] . . . When John Timothy Early awoke on June 17, 1982, he did not know that that would be the last day of his life.

[Defense attorney:] Your Honor, I object.

[Deputy prosecutor:] Your Honor, this is argument.

THE COURT: I haven't heard enough yet, counsel. You may object later.

[Deputy prosecutor:] Robert Wayne Hughes held his life in his hands, and then he extinguished it. That is how fragile our human existence is when a marauding stranger who comes to the door late at night, gets in that door—

[Defense attorney:] Your Honor, I object.

THE COURT: Sustained.

 Where improper argument is charged, the defense bears the burden of establishing the impropriety of the deputy prosecutor's comments as well as their prejudicial effect.[54]

The issue is then whether there is a substantial likelihood that the alleged misconduct affected the jury's verdict thereby depriving the defendant of a fair trial. Moreover, the resolution of this issue is within the sound discretion of the trial court.

(Footnotes omitted.) *State v. Mak,* 105 Wn.2d 692, 726, 718 P.2d 407 (1986).

The defendant has not met his burden of showing that the prosecutor's comments were improper or prejudicial. Nor is it likely that those comments affected the jury's verdict. Evidence of the Early murder was properly admitted when the defendant's statement on plea of guilty was read into evidence and when the defendant's girl friend testified.

---

[54]*State v. Mak,* 105 Wn.2d 692, 726, 718 P.2d 407 (1986).

This evidence undoubtedly had a greater impact upon the jury than the comments made in the deputy prosecutor's opening statement and argument. Furthermore, considerable evidence of the defendant's responsibility for the police sergeant's murder and the assault on another officer was admitted. A review of the record does not suggest that the jury convicted the defendant because he murdered John Early on June 17. Rather, it is clear that the jury convicted him because he shot two police officers on June 24. At most, the deputy prosecutor's references to the Early murder added some minor collateral details to evidence that was properly admitted; this did not constitute prejudicial error. Other argument by the deputy prosecutor, which is also referred to in defendant's appellate briefs as claimed error, was not objected to at the trial and does not constitute error.

The defendant also objects to the deputy prosecutor's conduct when the defendant was permitted to handle the murder weapon in front of the jury. The defendant wanted to make a demonstration with the unloaded rifle at trial. The defense first discussed this in the jury's absence, and the trial court ruled that the handling of the gun would be permitted under certain circumstances. The deputy prosecutor made no objection to this ruling out of the presence of the jury, but when the jury was called back in and the rifle handed to the defendant, the deputy prosecutor said, "Your Honor, if that is going to be handed to the defendant, I would object for the record." Her objection was overruled, and the demonstration continued. We perceive no error in this regard.

ISSUE FIVE.

CONCLUSION. The court correctly instructed the jury as to all of the elements of aggravated murder in the first degree; no error was committed in that regard.

The court gave the following instructions on aggravated murder in the first degree.

A person is guilty of Aggravated First Degree Murder if he has committed First Degree Murder and the victim

of such First Degree Murder was a law enforcement officer who was performing his or her official duties at the time of the act resulting in death and the victim was known by the person to be such at the time of the killing.

Instruction 6.

To convict the defendant Robert Wayne Hughes of the crime of aggravated murder in the first degree, as charged in Count I, each of the following elements of the crime must be proved beyond a reasonable doubt:

(1) That on or about the 24th day of June, 1982, the defendant shot and killed Samuel Hicks, a human being;

(2) That the defendant acted with unlawful intent to cause of [*sic*] the death of a human being;

(3) That the unlawful intent to cause the death was premeditated;

(4) That the victim was a law enforcement officer who was performing his official duties at the time of the killing;

(5) That the victim was known by the defendant to be a law enforcement officer at the time of the killing; and

(6) That the acts occurred in King County, Washington.

If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty as to count I.

On the other hand, if, after weighing all of the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty as to count I.

Instruction 11.

The defendant did not except to the giving of instruction 6 at trial and excepted to instruction 11 only on the basis that it did not identify the absence of self–defense as one of the elements to be proved. The defendant now contends that instruction 11 was erroneous because it failed to instruct the jury that the defendant had to know not only that the sergeant was a police officer, but that he was a police officer performing his official duties.

Instructions 6 and 11 adequately informed the jury of the elements of aggravated first degree murder. Instruction 6

follows the language of RCW 10.95.020(1) which defines the "law enforcement officer" category of aggravated first degree murder. Instruction 11 divides that category into 2 elements: "(4) That the victim was a law enforcement officer who was performing his official duties at the time of the killing; (5) That the victim was known by the defendant to be a law enforcement officer at the time of the killing." This division is consistent with the language of the statute and with the defendant's theory of the case. The defense theory was that the defendant had no actual knowledge that the officers were policemen. That defense, and the definition of aggravated first degree murder that resulted, is demonstrated in defense counsel's closing argument:

> Now, the first critical issue that you need to look at the instructions for is to find out what the elements of aggravated murder in the first degree are, and as the prosecution indicated, the additional element that makes it aggravated murder is knowledge that the victim was, in fact, a police officer.
>
> . . .
> Since actual knowledge is a necessary element of aggravated murder in the first degree, and as a practical matter, there is no sufficient evidence to indicate . . . that Bob Hughes knew that they were the police, the threshold step that you as jurors should take is to determine that Bob Hughes is not guilty of that charged offense.

The focus at trial was, therefore, on whether the defendant knew that the officers were policemen and not, as is now contended, on whether the defendant knew they were police but didn't know they were acting in their official capacity. It is highly unlikely that the latter argument would have been at all persuasive at trial. When the defendant first confronted the officers, he already knew that he had committed the murder of John Early. He testified that he told the police he expected to get caught because he had told four people that he killed John Early. If the defendant realized that the officers were policemen, it cannot reasonably be suggested that he did not know the

two officers were acting in their official capacity when they followed him into the driveway of the dairy farm where the shooting occurred. Accordingly, the instructions could not have been prejudicial in any event.

We conclude that error was not committed in the instructions on the elements of the crime of aggravated murder in the first degree.

Issue Six.

Conclusion. The State produced substantial evidence at trial showing that the killing of the police officer was premeditated.

██ The test for sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[55]

Premeditation is an essential element of first degree murder. The trial court instructed the jury that "the term 'premeditate' encompasses the mental process of thinking beforehand, deliberation, reflection, weighing or reasoning for an appreciable period of time, however long or short, but more than a mere moment in time."[56] The "more than a mere moment in time" phrase closely follows the statutory definition of premeditation.[57]

When the defense moved to dismiss at the close of the State's case in chief, claiming that the elements of knowledge, intent, and premeditation had not been established, the trial court denied the motion. The court observed that the testimony showed "that Sergeant Hicks was not killed immediately but after some period of time, during which the opportunity to meditate, think and withdraw from this course of action was presented".

We agree with the trial court that the State presented

---

[55]*State v. Green,* 94 Wn.2d 216, 221, 616 P.2d 628 (1980); *State v. Gerber,* 28 Wn. App. 214, 216–18, 622 P.2d 888 (1981).

[56]Instruction 8 (part).

[57]RCW 9A.32.020.

sufficient evidence of premeditation. The surviving detective testified that the officers identified themselves as such several times, including one time when the detective held up his badge at the defendant's request and the defendant then shot at it. The detective also testified that after several minutes of gunfire the defendant ran into a barn, and that the following lull was broken when the sergeant looked around a corner and was shot and killed by the defendant. Another factor is the detective's radio report when the sergeant was shot. The detective broadcast "Officer down" at 11:50:25. The sergeant had first radioed for assistance after one of the defendant's shots hit the Camaro at 11:43:25. The gunfire thus lasted about 7 minutes, demonstrably longer than a "moment in time".

Substantial evidence was thus presented by the State from which the jury could have concluded, as it did, that the officer's killing was premeditated.

ISSUE SEVEN.

CONCLUSION. The statements made by the defendant when he was in jail were properly admitted into evidence because they were freely and voluntarily made, and were relevant to the defendant's motive, intent and state of mind at the time he shot and killed the police officer.

The trial court allowed two corrections officers to testify about statements that the defendant made in the King County Jail shortly after his arrest. One officer talked to the defendant about the shooting incident, and testified that the defendant said that "when he saw these two plainclothes people approach him, he thought they were hit men out to kill him." The defendant also told the officer "that the men told him they were policemen, but that he didn't believe them as he hadn't seen a badge." When asked if there was any doubt that the defendant claimed he had been told the men were police, the officer replied "no". The officer also testified that the defendant was extremely hostile toward police officers in general, and toward him in particular. When asked how he expressed this hostility, the officer replied, "I think his words at the time was 'If you

open up the door, I will tear off your face.'" The court instructed the jury to disregard that comment. The witness then went on to testify that the defendant was hostile because he thought the police caused his brother's death at the Monroe Reformatory.

A second officer testified that he overheard a conversation that the defendant had with some other inmates. When the defendant was introduced as being in jail "for shooting a cop", Hughes added "accidentally" and laughed. He testified that the defendant then commented, "I wish I had kept the rifle. I could have got a few more of them." When another inmate asked "Maybe ten more?", the defendant replied, "Probably not. The swat team was out there with some weird machine guns."

The admissibility of evidence is determined generally by ER 401, 402, and 403.[58] ER 401 defines relevant evidence as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 402 states that relevant evidence is admissible. ER 403 allows such evidence to be excluded, however, "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury".

The trial judge has considerable discretion in balancing the probative value of evidence against its potential prejudicial impact.[59]

> Broad discretion must be accorded to the trial judge in such matters for the reason that he is in a superior position to evaluate the impact of the evidence, since he sees the witnesses, defendant, jurors, and counsel, and their mannerisms and reactions.

*State v. Coe,* 101 Wn.2d 772, 782, 684 P.2d 668 (1984), quoting with approval *United States v. Robinson,* 560 F.2d

---

[58]*State v. Rupe,* 101 Wn.2d 664, 686, 683 P.2d 571 (1984).

[59]*State v. Coe,* 101 Wn.2d 772, 782, 684 P.2d 668 (1984); *State v. Hightower,* 36 Wn. App. 536, 545, 676 P.2d 1016 (1984).

507, 514 (2d Cir. 1977), *cert. denied,* 435 U.S. 905 (1978). The trial court's decision to admit relevant evidence will not be reversed absent manifest abuse of its discretion.[60]

The trial judge admitted the defendant's statements made in jail because they were relevant evidence of his motive and intent as well as of his state of mind regarding police officers. The defense admitted the importance and relevance of the statements in discussing the possibility of calling a witness to rebut them (the witness, a Mr. King, was never called):

> Well, the testimony of Mr. King relates to a couple of statements that are very powerful and relate to central issues in the case. The statement of Officer McClelland that he heard Mr. Hughes characterize the shooting of Sergeant Hicks as accidental and then laughed, is certainly something that goes to the heart of the defense case, just as is the testimony of Officer Covington that Mr. Hughes said that he heard them, the officers, identify themselves as police.
>
> Those statements are directly related to the disputed issues in the case . . .

Within the context of this case, the trial court did not err by deciding that the probative value of the statements made by the defendant in jail outweighed the danger of unfair prejudice, and in admitting the corrections officers' testimony.

ISSUE EIGHT.

CONCLUSION. The power of a court to impose sentence in a criminal case depends upon a grant of legislative authority. That authority will not be challenged so long as it does not contravene the constitutional provisions prohibiting cruel and unusual punishment and excessive fines. The mandatory statutory sentence in this case was not unconstitutional.

Washington statutes mandate that when the death penalty is sought but not obtained in aggravated murder in the first degree cases such as this one, the defendant shall

---

[60]*Hightower,* at 545.

be sentenced to life imprisonment without possibility of parole.[61]

Accordingly, this court has refused to allow a sentence of life imprisonment without parole to be mitigated to life imprisonment with possibility of parole during a capital sentencing proceeding.[62] Furthermore, we have also declined to accept the argument that life imprisonment without parole is cruel and unusual punishment, and have held that a defendant has no right to have his sentence mitigated by possible parole.[63]

So long as the Legislature does not violate the state and federal constitutional directives against cruel and unusual punishment or excessive fines, it may restrict judicial discretion in imposing criminal sentences.[64] We uphold the constitutionality of RCW 10.95.030(1) and .080(2).

We note here that the State presented three issues on cross appeal relating to several claimed errors made by the trial court in rulings against the State. Since our resolution of the issues raised by the defense precludes a new trial, we will not address the issues raised by the State.[65]

We next turn to the issues raised by the defendant in his pro se brief.

The defendant charges that various witnesses lied while testifying. It is the function and province of the jury to weigh the evidence, to determine the credibility of the wit-

[61]RCW 10.95.030(1), .080(2); *State v. Kincaid,* 103 Wn.2d 304, 310, 692 P.2d 823 (1985).

[62]*See State v. Dictado,* 102 Wn.2d 277, 296, 687 P.2d 172 (1984); *State v. Grisby,* 97 Wn.2d 493, 497, 647 P.2d 6 (1982), *cert. denied sub nom. Frazier v. Washington,* 459 U.S. 1211, 75 L. Ed. 2d 446, 103 S. Ct. 1205 (1983).

[63]*See Dictado,* at 296–97; *Grisby,* at 498.

[64]*State v. Mulcare,* 189 Wash. 625, 628, 66 P.2d 360 (1937); *see also State v. Bryan,* 93 Wn.2d 177, 181, 606 P.2d 1228 (1980).

[65]RAP 2.4(a).

nesses, and to decide the disputed questions of fact.[66] As an appellate court, we cannot retry factual issues.[67] The defendant's allegations in this regard are thus without merit.

The defendant also argues that he was prejudiced because jurors were inattentive during the trial. The drowsiness of some jurors concerned the trial court. The courtroom was poorly ventilated, and always crowded. The judge therefore asked the jury to stand and stretch every half hour. Despite this, one juror continued to doze and was replaced with an alternate juror. Thereafter, whenever counsel suggested that a break was necessary, the court asked the jury to rise and stretch.

The determination as to whether the jury was so inattentive that the defendant was prejudiced is another matter addressed to the trial court's discretion, and is reviewable only for abuse.[68] Unless counsel objects to the jurors' inattentiveness during trial, the error is waived on appeal.[69]

Here, defense counsel brought the jurors' drowsiness to the court's attention and agreed that frequent breaks would solve the problem. When defense counsel alerted the court to one juror's continued sleepiness, the court excused the juror despite his protestations. The drowsiness issue was not again brought to the court's attention, except when breaks were requested. Both counsel and the court were aware of the potential problem, monitored it and handled it appropriately. Nothing suggests that the jury drowsiness problem was such as to prejudice the defendant.

Error is also assigned by the defendant to an agreement

---

[66]*State v. Snider*, 70 Wn.2d 326, 327, 422 P.2d 816 (1967); *State v. McDaniels*, 30 Wn.2d 76, 88, 190 P.2d 705 (1948).

[67]*Snider*, at 327; *State v. Hardy*, 37 Wn. App. 463, 469, 681 P.2d 852 (1984).

[68]Annot., *Inattention of Juror From Sleepiness or Other Cause as Ground for Reversal or New Trial*, 88 A.L.R.2d 1275, 1276 (1963).

[69]*Casey v. Williams*, 47 Wn.2d 255, 257, 287 P.2d 343 (1955).

counsel made regarding the Camaro. After trial the State asked to withdraw the automobile, State's exhibit 134, because of the public expense that would be incurred by retaining it pending the defendant's appeal. The State noted that the jury had viewed the car, that experts had studied the car and that photographs of it had been taken by both parties. The defense originally objected to the release, and then requested a stay of the release and the expenditure of public funds so that a criminologist could study the Camaro and take additional photographs.

The trial court authorized the requested expenditure of funds as well as the requested stay. Later, on November 14, 1983, the court finally ordered the car released to the King County Police Department. There was no prejudice to the defendant in this regard.

The defendant also claims that his case was prejudiced because the wounded detective drove the Camaro to a nearby farm after the sergeant was killed. The defense commented on this as an example of what it claimed was the detective's inability to think clearly after the shooting. We perceive no prejudice to the defendant in this.

The defendant assigns error to the deputy prosecutor's statement in closing argument that the defendant blamed the police for his brother's death. As previously discussed, a corrections officer had testified that the defendant blamed the police for his brother's death at the Monroe Reformatory. The deputy prosecutor was justified in referring to this in her closing argument.

Error is also assigned to the deputy prosecutor's references to the defendant's drug deals. It was by the defendant's own testimony that the topic of drug deals was introduced into the case. He testified that he thought that Bangkok drug dealers had hired people to kill him because they mistakenly thought he had stolen money and drugs from one of their local sellers; he also testified that he had dealt with these people before. On cross examination, the defendant admitted buying and selling drugs, though he did resist being categorized as a drug dealer. The defendant

having himself introduced the subject, he cannot now be heard to complain that the deputy prosecutor used the Bangkok deal "to make me look bad".

Finally, defendant requested his own copy of the documents produced on discovery to assist him in preparing his pro se brief. The defendant's request was properly denied by the trial judge and by the Clerk of the Supreme Court, since discovery material is specifically restricted to the exclusive custody of defense counsel.[70] Furthermore, the appellate record is limited to the verbatim report, clerk's papers and exhibits.[71] As the Clerk noted in his ruling, "Appellant has failed to show how the discovery may properly come before this Court." This court then duly denied the defendant's motion to modify the Clerk's decision. This issue is without merit and is now moot in any event.

The defendant was fairly tried, convicted of aggravated murder in the first degree and sentenced to life imprisonment without possibility of parole on that charge. Similarly, his conviction of assault in the first degree was also proper.

Affirmed.

DOLLIVER, C.J., and UTTER, BRACHTENBACH, DORE, PEARSON, CALLOW, GOODLOE, and DURHAM, JJ., concur.