[No. 13384-2-III.   Division Three.   March 19, 1996.]

THE STATE OF WASHINGTON, *Respondent*, v. RANDY
MCREYNOLDS, *Appellant*.

*Donald W. Engel* and *Law Offices of Roger Garrison*, for
appellant.

*Jeffrey C. Sullivan, Prosecuting Attorney*, and *Bruce
Hanify, Deputy*, for respondent.

SCHULTHEIS, J. — Randy McReynolds was charged with four counts of delivery of cocaine. A jury acquitted him of two counts, could not reach a decision on one count and convicted him of one count. He appeals, contending the court should have instructed the jury that if it found he believed he was working for the police as a confidential informant, his actions were lawful based upon RCW 69.50.506(c), which states: "No liability is imposed by this chapter upon any authorized state, county or municipal officer, engaged in the lawful performance of his duties." We affirm.

In May 1992, Mr. McReynolds walked into the Zillah police station and volunteered his services to the LEAD Task Force.[1] He told Detectives Ron Shepard and Mike Everts he wanted to help rid the Buena and Toppenish areas of drug activity by working for them as a confidential informant. They questioned him regarding the whereabouts of several fugitives wanted in connection with illegal drug transactions and arranged to meet with him again a week or two later. In the interim, Mr. McReynolds called the detectives with information about two of the fugitives.

At Mr. McReynolds' second meeting with Detectives Shepard and Everts, on May 26, they recruited him as an informant and had him read and sign two documents: (1) a consent to have his conversations recorded and (2) an admonishment advising him he is not a police officer, is not to violate any law to gather information, and shall not possess, sell or deliver drugs except as specifically directed by a LEAD Task Force detective. The detectives directed

---

[1]L.E.A.D. is the acronym for Law Enforcement Against Drugs. We adopt the spelling most commonly used by the multi-agency group: LEAD Task Force.

Mr. McReynolds to look for drug sources and gather information, but warned him not to use or sell drugs, or become involved in any drug deals. Mr. McReynolds told them he knew a cocaine dealer named Sandy Clark, and he would try to recruit her as an informant or discover her drug sources.

During approximately the same period, Stan Rolison also approached the task force. He explained he had a drug problem and had unsuccessfully tried everything to beat his addiction; he now wanted to burn his drug connection bridges and help get the drug dealers off the streets. The task force signed him on as a confidential informant, and Detectives Shepard and Everts worked with him. Mr. Rolison identified Mr. McReynolds (known to him only as Randy) as a possible drug dealer in Buena.

Detectives Shepard and Everts decided not to have Mr. McReynolds make any buys for them; instead, they set up a sting operation targeting Mr. McReynolds. On June 2 and 3, 1992, Mr. Rolison contacted Mr. McReynolds under the direction and supervision of the task force, and took delivery of cocaine four times. Mr. McReynolds was charged with four counts of delivering cocaine. At trial, the deliveries were described as follows:

DELIVERY No. 1, JUNE 2 (COUNT IV). Mr. Rolison took $20 buy money, drove to Harper Lane to find Mr. McReynolds, and when he found him, asked to buy cocaine. Mr. McReynolds got into the car with Mr. Rolison, and they drove to a trailer park on Burr Street. Mr. Rolison saw a man he knew as Ramon or Raymond and asked Mr. McReynolds if he could get him a 20 ($20 worth of cocaine, one-fourth gram). Mr. Rolison testified Mr. McReynolds walked up to a trailer, knocked, entered when a man opened the door, brought back cocaine which he handed to Mr. Rolison, asked for the money, took the money to a spot between the trailer and a parked car, and threw the money on the ground for the man in the trailer to retrieve after they left. Mr. McReynolds denied handling the money or the cocaine; he testified Mr. Rolison dealt

directly with Ramon. On this count, the jury found Mr. McReynolds not guilty.

DELIVERY NO. 2, JUNE 3 (COUNT I). While looking for Mr. McReynolds, Mr. Rolison ran into a woman named Carol at Buena Bill's tavern; he asked if she could get him a 20. She indicated she or her son David could. The three of them went to a labor camp near the Golden Nugget Market, and David went to one of the trailers. Mr. Rolison testified David was unsuccessful, so he dropped them off at the tavern and drove to Mr. McReynolds' house. He testified he asked Mr. McReynolds for a $20 bag and Mr. McReynolds gave him a bag of cocaine from the bookshelf. Mr. Rolison thought that he handed the money to Mr. McReynolds, but said he might have placed it on the bookshelf. Mr. McReynolds denied any drug transaction took place in his house. He testified Mr. Rolison asked where Ms. Clark was, and he replied she was at home or at the transient camp on Burr Street. Mr. McReynolds testified Mr. Rolison asked him to go with him to the camp to buy cocaine, but he declined. Once again the jury found Mr. McReynolds not guilty.

DELIVERY NO. 3, JUNE 3 (COUNT II). Detective Shepard assigned an undercover officer, Yakima Indian Nation tribal police detective Emmett Shade, to accompany Mr. Rolison and attempt to purchase cocaine from Mr. McReynolds. Mr. Rolison and Detective Shade were driving toward Buena to find Mr. McReynolds when he passed them on the highway, going in the opposite direction. Mr. McReynolds, accompanied by Ms. Clark, was headed toward Toppenish. The men waved at each other, did U-turns, and pulled alongside each other on the shoulder of the road. Mr. Rolison introduced Detective Shade as a co-worker and told Mr. McReynolds he wanted to buy two 20s ($40 worth of cocaine, two one-fourth grams or one one-half gram) and his co-worker wanted to buy a teener (one-sixteenth ounce, a 16th, about $60 worth). Mr. Rolison and Detective Shade both testified Mr. McReynolds got out of his truck and handed two small packages of

cocaine to Mr. Rolison, who handed him the money, two $20 bills. They testified he told them the packages were a little short, but they were on the way to get more cocaine, and he would make up the difference later. They said Mr. McReynolds told them to meet him and Ms. Clark after 7:00 that evening at the tavern.

Mr. McReynolds admitted participating in the drug exchange, although he described it differently. He testified he told Mr. Rolison he did not have two 20s and a 16th, but he would ask Ms. Clark. She said she had the two 20s but not the 16th; he could get that from her at the bar later that evening, after 7:00. Mr. McReynolds testified Ms. Clark removed the cocaine from her bra and handed it to him, he passed it through his window to Mr. Rolison, who handed him two $20 bills, which he then handed to Ms. Clark. Mr. McReynolds claimed he "just got caught up in the situation" and did not think he was doing anything wrong. He testified they were on their way to meet with one of Ms. Clark's dealers and he really wanted to be there because he knew the man was someone who had large quantities of cocaine. He testified he later gave the name of the source to the detectives. The jury found Mr. McReynolds guilty.

DELIVERY NO. 4, JUNE 3 (COUNT III). Shortly after 7:00 P.M. Mr. Rolison and Detective Shade located Mr. McReynolds' pickup parked at Buena Bill's tavern. They testified Mr. McReynolds and Ms. Clark were standing near the pickup, talking to someone who left as they pulled up. They also both testified that Ms. Clark handed Mr. Rolison the teener. They told Mr. McReynolds it looked light. He agreed and said he only paid $50 for it, so he was going to charge them less. Detective Shade said they only had three $20 bills, asked if he could make change and reminded him the two 20s had also been light. Mr. Rolison and Detective Shade both testified Mr. McReynolds told Ms. Clark to go weigh out another 20 and that she left and returned two or three minutes later with more cocaine wrapped in a torn piece of brown plastic garbage bag,

which she handed to them. Detective Shade handed the three $20 bills to Mr. Rolison, who handed them to Mr. McReynolds; he put the money in his pocket. Mr. Rolison and Detective Shade testified Mr. McReynolds bragged about the quality of his cocaine. Mr. McReynolds testified he stood by Ms. Clark at her request because she was worried about getting ripped off, but he did not handle either the cocaine or the money. He testified the deal was Ms. Clark's. The jury could not reach a verdict, and a mistrial was declared on this count.

On June 11, 1993, the court entered judgment on the single guilty verdict and sentenced Mr. McReynolds within the standard range to 24 months.

On appeal, Mr. McReynolds contends the court erred by refusing to give his proposed jury instruction based on RCW 69.50.506(c). His proposed instruction reads: "Delivery of a controlled substance is lawful or excused if when the delivery occurs, the Defendant believes that he is acting as an agent of any authorized state, county, or municipal officer, engaged in the lawful performance of his duties."

Both the State and a criminal defendant are entitled to instructions that, taken as a whole, properly instruct the jury on the applicable law and allow both parties to argue their theories of the case. *State v. Cyrus*, 66 Wn. App. 502, 508, 832 P.2d 142 (1992), *review denied*, 120 Wn.2d 1031 (1993). Neither party, however, is entitled to have its theory submitted to the jury if it is not supported by substantial evidence. *State v. Hughes*, 106 Wn.2d 176, 191, 721 P.2d 902 (1986).

RCW 69.50.401 makes delivery of a controlled substance unlawful, except as authorized by statute. RCW 69.50.506(c) is a statutory exception for authorized state, county or municipal officers engaged in the lawful performance of their duties. To invoke the statutory immunity of RCW 69.50.506(c), Mr. McReynolds had to establish (1) he was an authorized officer (2) engaged in the lawful performance of his duties. *See Loveday v. State*, 546 S.W.2d

822, 825 (Tenn. Crim. App. 1976); RCW 69.50.506(a) (the person claiming an exception bears the burden of proving it applies). He could not do that. Mr. McReynolds acknowledged in writing his understanding that he was not a police officer, did not have any legal authority, did not have authority to violate any criminal law to gather information or provide confidential informant services, and could not engage in any cocaine transactions except under specific direction by a LEAD Task Force detective.

Mr. McReynolds concedes there is no direct authority supporting his argument that a confidential informant or agent of the police should be covered by the statute, but asserts the argument is supported by analogy. He contends that if a confidential informant or agent of the police acting at the direction of the police must comply with constitutional safeguards when conducting a search, *see Coolidge v. New Hampshire*, 403 U.S. 443, 487, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971); *Kuehn v. Renton Sch. Dist. 403*, 103 Wn.2d 594, 600, 694 P.2d 1078 (1985), then in appropriate circumstances they should also enjoy police immunity granted by statutes such as RCW 69.50.506(c).

Mr. McReynolds' analogy is flawed. *Coolidge*, 403 U.S. at 487, extends the protection of the Fourth Amendment and the exclusionary rule to searches conducted by confidential informants or agents *acting at the direction of the police*. Mr. McReynolds, however, was not acting at the direction of the police when he delivered cocaine. He was given explicit written and verbal warnings not to possess, sell or deliver drugs except as specifically directed by a LEAD Task Force detective; he ignored those warnings at his own risk.

It is not necessary to address whether a confidential informant is entitled to a privileged activity instruction based on RCW 69.50.506(c), because Mr. McReynolds was not prosecuted for a drug transaction in which he was acting at the direction of the police. Mr. McReynolds' proposed instruction based on RCW 69.50.506(c) was not warranted by the evidence, nor, based as it is upon his subjective belief, is it an accurate statement of the law.

We affirm.

SWEENEY, C.J., and MUNSON, J., concur.