IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 30630-5-III |
| Respondent, | ) | (consolidated with |
| | ) | No. 31530-4-III) |
| v. | ) | |
| | ) | |
| DANIEL FARIAS, | ) | |
| | ) | UNPUBLISHED OPINION |
| Appellant. | ) | |

SIDDOWAY, J. — Daniel Farias was convicted of a first degree assault of his mother. He argues on appeal that he was denied due process and the right to present a defense when the trial court refused to instruct the jury on the potential relevance of voluntary intoxication to the element of intent. Mr. Farias has no recollection of the assault, however, and can offer no direct or medical evidence of his level of intoxication or its effect on him at the time the assault occurred. At best, he presented evidence of the possibility that he consumed enough alcohol to have rendered him too intoxicated to form the intent to inflict great bodily harm.

Where there is no evidence that a defendant was incapable of forming the required intent but only the possibility, the proper basis for submitting that possibility to the jury is

with instruction and argument on the State's burden of proof. The burden of proof was instructed and argued here. We find no error and affirm.

FACTS AND PROCEDURAL BACKGROUND

On the afternoon of January 3, 2011, Daniel Farias, an admitted alcoholic who had just completed a year of outpatient treatment for his addiction, started drinking around 3 p.m. while running errands with his girl friend. He figured he had been doing well and could have just one beer. He bought a 40-ounce bottle of beer and drank it fast. He then bought another 40-ounce bottle and drank most of that on the way to the home of his sister, Cecilia Williams, where he and his girl friend planned to watch movies with Ms. Williams and her children. Upon arrival at Ms. Williams's home, he sat in the car to finish the beer before going inside. Mr. Farias would later testify to only fuzzy memories from that point on.

He did not stay long at his sister's; he left, without his girl friend, to run an errand. He was later dropped off at the home of his nephew, Martin. He might have arrived at Martin's house with beer. He stayed there for a few hours, and then, at about 11 p.m., Martin drove him to the grocery store to buy more beer.

The night manager at the grocery store, concluding that Mr. Farias was drunk, refused to sell him alcohol. The manager would later testify that Mr. Farias was being obnoxious; he smelled of alcohol and, when told he could not buy beer, he shouted and

2

made threats. After he left, the manager called the police to report the incident and Mr. Farias's condition.

Martin then drove Mr. Farias to a gas station where Mr. Farias was able to purchase a 12-pack of beer. As Mr. Farias came out of the station, he encountered two police officers responding to the disturbance call from the grocery manager. They spoke to him about the call and satisfied themselves that Mr. Farias was not driving. One of the officers would later testify that Mr. Farias was acting "slightly animated," his voice was slurred, and he smelled of alcohol, from which the officer concluded that he was intoxicated. Report of Proceedings (RP) at 386. Mr. Farias was able to understand and answer their questions, though, was not staggering or stumbling, and the officers watched him walk to his nephew's vehicle, open the door, and get into the passenger's side without assistance. The officer who later testified described Mr. Farias as cooperative throughout their interaction.

Martin evidently dropped Mr. Farias off at Ms. Williams's house, but the family had long since finished watching movies. Ms. Williams stopped him as he entered, drunk and carrying a 12-pack, and told him he could not stay. She drove him back to the mobile home of their mother, Maria Farias, with whom Mr. Farias had been living for about eight months.

Mr. Farias later testified that upon arriving home, he went inside and turned on the television. According to him, his mother opened her bedroom door and asked if he was

3

staying the night, which he said he was. She commented on the fact that he was drinking, to which he responded, "'Yeah, it's alright. It'll be okay.'" RP at 434. When he awoke the following day, about noon, all of the beer was gone.

At about 3 p.m. the following day Ms. Williams arrived at the mobile home, having learned that Ms. Farias did not report for work at her fruit sorting job that morning, which was unusual. Ms. Williams was concerned that her brother might have hurt their mother; he had done it once before. When she told Mr. Farias that she wanted to see her mom, Mr. Farias said that she was sleeping. Ms. Williams demanded that Mr. Farias wake their mother and send her out, or she would call the police. Mr. Farias ignored her and went back inside.

Ms. Farias called the police, who arrived shortly thereafter. They entered the mobile home despite Mr. Farias's insistence that Ms. Farias was asleep and discovered her in the bedroom of the mobile home, lying critically injured under a pile of blankets. Later investigation revealed blood spatters on the wall outside the bedroom, bloodstained clothing, a bloodied mop and towel, and other items. It was apparent that an effort had been made to clean blood from the hallway floor.

Ms. Farias was transported to the emergency room, unconscious. She was admitted in critical condition with multiple organ systems malfunctioning, obvious external injuries including bruising and fractured face bones, and possible internal organ

4

injuries. Due to the extent of her injuries, Ms. Farias was airlifted to Harborview Medical Center in Seattle.

Detective Dave Helvey interviewed Mr. Farias at the sheriff's office. During a break after the first of two interviews, Mr. Farias told the detective, "'I think I did this to my mom.'" RP at 109. Detective Helvey noted that Mr. Farias's right hand was red and appeared scratched. Mr. Farias acknowledged the only people who had been in the house the previous night were him and his mother. Mr. Farias told police he did not hurt his mother, but had no explanation for her injuries.

The State charged Mr. Farias with first degree assault with special allegations of aggravating circumstances.

At trial, Mr. Farias asked that the jury be instructed on voluntary intoxication and offered two proposed instructions. The court declined to provide either, explaining,

> The Court is familiar with the elements that are necessary, and primarily the third element that affects the ability to acquire the proper mental state. There was really only testimony that he'd had two 40-ouncers, seven beers in this particular matter. He also testified that he had some alcohol at his nephew's, didn't testify as to how much, and the officers, at about midnight, although he apparently ran into some trouble at Safeway, the officers at midnight testified that, being experienced officers in people with intoxication, that he was intoxicated, but he wasn't exhibiting the signs of being overly intoxicated . . . . Defendant himself testified that he remembered all of those contacts. The Defendant testified that he remembered going home. The Defendant testified that he remembered his mother coming to the door and saying good night to him, and then the Defendant testified he went to the couch and fell asleep.

RP at 537-38.

5

In closing argument, Mr. Farias's lawyer made the following argument from the

court's instructions, without objection:

> [I]f you get to the point where you believe that Daniel did this, if you get to
> that point, you have to determine whether or not he committed this offense
> with the intent, a specific intent, a term of art, a legal term, if he intended to
> do great bodily harm. It's not enough for you to go back in there and say,
> "He did it. He's guilty." The State has to prove beyond a reasonable doubt
> to all of you unanimously that Daniel intended to inflict the harm on his
> mother that she suffered. You have to find that he had in his mind that,
> "I'm going to go down that hall, I'm going to bust open my Mom's door,
> and I'm going to almost kill her." The State hasn't proven that. Even if
> you believe the State has proved that she did it (sic), the State has not
> proven to you that he intended the harm that his mom suffered.
> Take into consideration his state of mind. Take into consideration
> what he had been doing for the hours, the day before his mom was
> assaulted. Take all that into account. Take into account the description of
> his demeanor, how he acted. Take into account the witnesses' testimony
> and put the State to its burden of proof on the issue of intent. It's just not
> an automatic foregone conclusion that just because his poor mother
> suffered these injuries that he had any intent, if you find, again, if you find
> that he did this, to inflict that type of harm. That's what makes this assault
> in the first degree. The highest level of assault that there is in this country.
> So that's an important issue for all of you to discuss.

RP at 593-94 (second alteration in original).

Mr. Farias was found guilty as charged, including all of the aggravating

circumstances alleged by the State. He appeals.

## ANALYSIS

Mr. Farias's appellate lawyer's brief raises a single issue: it challenges the trial

court's refusal to give either of his proposed instructions on voluntary intoxication.

6

RCW 9A.16.090,[1] provides:

> No act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of his or her condition, but whenever the actual existence of any particular mental state is a necessary element to constitute a particular species or degree of crime, the fact of his or her intoxication may be taken into consideration in determining such mental state.

"[I]ntoxication is not a 'defense' to a crime." *State v. Coates*, 107 Wn.2d 882, 891, 735 P.2d 64 (1987). It may raise a reasonable doubt as to the mental state element of the offense. *Id.* Where the evidence raises an issue as to the effect of a defendant's intoxication on his ability to formulate the requisite mental state, the statute "describes the manner in which [that] type of evidence is to be employed, in much the same way as neutral instructions describe the use of inferences or circumstantial evidence." *Id.* at 890.

Each side is entitled to have the trial court instruct upon its theory of the case if there is evidence to support the theory; on the other hand, it is prejudicial error to submit an issue to the jury when there is not substantial evidence concerning it. *State v. Hughes*, 106 Wn.2d 176, 191, 721 P.2d 902 (1986). Where a defendant seeks an instruction explaining how the jury may consider evidence of voluntary intoxication as bearing on intent, it is well settled that he or she must show (1) the charged crime has a specific mental state, (2) there is substantial evidence the defendant was drinking, and (3)

---

[1] We quote the current version of RCW 9A.16.090, which was amended by Laws of 2011, chapter 336, section 355 to make the language gender neutral.

7

evidence that the defendant's drinking affected his or her ability to form the required mental state. *State v. Gabryschak*, 83 Wn. App. 249, 252, 921 P.2d 549 (1996); *State v. Everybodytalksabout*, 145 Wn.2d 456, 479, 39 P.3d 294 (2002); *State v. Gallegos*, 65 Wn. App. 230, 238, 828 P.2d 37 (1992). Evidence of drinking alone is insufficient; there must be substantial evidence of the alcohol's effects on the defendant's mind or body. *Gabryschak*, 83 Wn. App. at 253. "Put another way, the evidence must reasonably and logically connect the defendant's intoxication with the asserted inability to form the required level of culpability to commit the crime charged." *Id.* at 252-53.

When considering whether a proposed jury instruction is supported by the evidence, the trial court must examine the evidence and draw all reasonable inferences in the light most favorable to the requesting party. *State v. Hanson*, 59 Wn. App. 651, 656-57, 800 P.2d 1124 (1990). We review a trial court's refusal to give a voluntary intoxication instruction for abuse of discretion. *State v. Priest*, 100 Wn. App. 451, 454, 997 P.2d 452 (2000).

One problem with giving the voluntary intoxication instruction in this case is that the jury was presented with no evidence as to the level of Mr. Farias's intoxication at the time Ms. Farias was assaulted. Fifteen hours passed between the time Ms. Williams dropped him off at the mobile home and the time Ms. Farias was discovered injured the following day. At the time of Mr. Farias's encounter with police at the gas station late in the evening on January 3, he had been able to consummate the purchase of beer, was able

to understand and respond to the officers' questions, and walked without apparent impairment to his nephew's car. It is true that he had another 12 cans of beer with him when dropped off at his mother's mobile home and there is circumstantial evidence he consumed them sometime between midnight and noon the following day. But there is no evidence he drank any of the 12 beers before assaulting his mother. He might have been no more intoxicated at the time of the assault than he was during his encounter with police officers at the gas station; he might have been even less intoxicated.

Another problem is that given the unknown time of the assault, the unknown level of Mr. Farias's intoxication at that time, and the fact that neither Mr. Farias nor his mother could recall how the assault happened, there is no evidence bearing on whether or how Mr. Farias's drinking affected his ability to form the intent to inflict great bodily harm, the mental state required for assault in the first degree. The fact that he cannot recall the assault is not evidence that he did not intend to inflict great bodily harm. *See State v. Thomas*, 123 Wn. App. 771, 780-81, 98 P.3d 1258 (2004) (trial court properly excluded expert testimony that defendant had experienced an alcoholic blackout leaving her with no recollection of an assault because the blackout is not evidence that she could not form the intent to commit assault in the first degree).

The court's instructions informed the jury that to convict Mr. Farias of first degree assault, one of the elements that the State must prove beyond a reasonable doubt was that in assaulting Ms. Farias, "the Defendant acted with intent to inflict great bodily harm."

Clerk's Papers (CP) at 126. Mr. Farias's lawyer was able to argue, and did argue, that the jury should find reasonable doubt as to the element of intent. For the court to have given a voluntary intoxication instruction, though, would have been to invite the jury to speculate about Mr. Farias's condition and mental culpability at a time for which the jury had no evidence.

The well settled criteria for giving the voluntary intoxication instruction were not demonstrated by Mr. Farias. The trial court properly refused to give it.

## STATEMENT OF ADDITIONAL GROUNDS

In an untimely pro se notice of appeal, Mr. Farias assigns error to two related matters: the trial court's decision to admit evidence of his earlier assault of his mother and ineffective assistance of appellate counsel in failing to challenge the admission of that evidence. Mr. Farias is not entitled to two appeals but he is entitled to file a pro se statement of additional grounds (SAG) identifying matters that he believes were not adequately addressed by his lawyer's brief. In order to serve the ends of justice, we waive the applicable deadline and review his pro se notice of appeal as a SAG.

Before trial, the State moved for a determination that the court would admit evidence that Mr. Farias assaulted his mother in May 2010. It contended that the evidence was admissible under ER 404(b) to establish the domestic violence aggravator it had charged, citing *State v. Baker*, 162 Wn. App. 468, 259 P.3d 270 (holding that a prior assault of a victim of domestic violence was admissible to prove motive, absence of

10

mistake, or accident, or to assist the jury in assessing the credibility of the victim), *review denied*, 173 Wn.2d 1004 (2011) and *State v. Anderson*, 42 Wn. App. 659, 713 P.2d 145 (1986) (where defendant claimed to be too intoxicated to form the required intent, evidence that he had earlier committed an identical crime is admissible to prove intent).

Mr. Farias contends that admitting evidence of his prior assault substantially and unfairly prejudiced him, implying that in weighing prejudice against probative value under ER 403 the trial court underestimated the prejudicial impact of the evidence.

Under ER 404(b), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Such evidence may be admissible "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." ER 404(b). "'It is undoubtedly the rule that evidence of quarrels between the victim and the defendant preceding a crime, and evidence of threats by the defendant, are probative upon the question of the defendant's intent.'" *State v. Powell*, 126 Wn.2d 244, 261, 893 P.2d 615 (1995) (quoting *State v. Parr*, 93 Wn.2d 95, 102, 606 P.2d 263 (1980)).

Before admitting evidence under ER 404(b) a trial court "must (1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value

11

against the prejudicial effect." *State v. Vy Thang*, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002).

The court considered the State's motions in limine at a pretrial hearing. In support of admitting evidence of the prior assault, the State offered the testimony of Ms. Williams that some eight months before the assault for which Mr. Farias was being tried, she had traveled to her mother's mobile home after repeatedly calling and asking to speak to her mother, only to be told by Mr. Farias that their mother was sleeping. Upon arriving at the mobile home Ms. Williams observed shattered glass on the dining room floor. Mr. Farias was sweeping the floor and claimed that a plate had fallen and broke.

Ms. Farias was standing outside her bedroom crying, however, and told Ms. Williams, "'Daniel tried to kill me.'" CP at 50. Ms. Farias was wearing an apron whose buttons were torn off and her glasses were crooked. The mattress in her bedroom was flipped and the doorframe to the room was cracked. When Ms. Williams asked her what had happened, Ms. Farias said that Mr. Farias had gotten in an argument with his girl friend and was upset. Mr. Farias interrupted, telling his mother to shut up, saying that she was crazy, and glaring at her in an intimidating manner. Ms. Williams told her mother to gather some belongings and took Ms. Farias to stay at the Williams home.

The trial court ruled that the prior assault was relevant to establish the domestic violence aggravating factor and to establish motive and absence of mistake or accident. Applying the balancing required by ER 403, the court found the evidence quite probative

12

in light of Mr. Farias's expected defense that he was intoxicated and acted in an uncontrolled and unintentional manner, stating, "I think it is probative as to lack of mistake. I think it's probative as to motive, and I think it's more probative than it is prejudicial . . . . So the Court would allow the testimony." RP at 53.

The decision to admit evidence under ER 404(b) is reviewed for an abuse of discretion. *State v. DeVincentis*, 150 Wn.2d 11, 17, 74 P.3d 119 (2003). A trial court abuses its discretion if it fails to abide by the rule's requirements. *State v. Foxhoven*, 161 Wn.2d 168, 174, 163 P.3d 786 (2007). Discretion is also abused if it is exercised on untenable grounds or for untenable reasons. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971). We review a trial court's balancing of the probative value of evidence against its prejudicial effect or potential to mislead under ER 403 "with a great deal of deference, using a 'manifest abuse of discretion' standard of review." *State v. Luvene*, 127 Wn.2d 690, 706-07, 903 P.2d 960 (1995). In reviewing for manifest abuse of discretion, we will affirm the trial court's decision unless no reasonable judge would have reached the same conclusion. *Tatham v. Rogers*, 170 Wn. App. 76, 106, 283 P.3d 583 (2012).

Here, the trial court abided by the requirements of ER 404(b) in deciding whether to admit the evidence and came to a reasoned decision. It did not abuse its discretion in admitting the prior assault under ER 404(b).

Mr. Farias makes a related assignment of error to what he claims was the ineffective assistance of his counsel in failing to raise this issue in his appeal. To establish ineffective assistance of counsel, Mr. Farias must show both that (1) defense counsel's representation was "deficient" and (2) the deficient representation prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). The failure to show either element ends our inquiry. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011).

Mr. Farias's trial lawyer zealously resisted admission of evidence of the assault. He lost the argument after the trial court considered and addressed all of the matters required before ruling on the admissibility of evidence under ER 404(b). Given the applicable standard of review, appellate counsel could reasonably conclude that appealing the trial court's decision to admit the evidence was pointless. Appellate counsel is not ineffective where, as here, an appeal of the trial court's ruling would fail. *State v. Nichols*, 161 Wn.2d 1, 14-15, 162 P.3d 1122 (2007).

Affirmed.

A majority of the panel has determined that this opinion will not be printed in the

14

Nos. 30630-5-III; 31530-4-III
*State v. Farias*

Washington Appellate Reports but it will be filed for public record pursuant to RCW

2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Korsmo, C.J.

_____
Kulik, J.

15