**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

THE STATE OF WASHINGTON,

              Respondent,

      v.

MARCUS BRADLEY WILLIAMS,

              Appellant.

No. 83628-5-I

DIVISION ONE

UNPUBLISHED OPINION

MANN, J. — Marcus Williams appeals his conviction for felony hit and run, arguing that the to-convict instruction omitted an essential element of the crime. He also argues that the trial court erred by (1) denying his request to recess so that a juror who had been observed sleeping could rest and (2) ordering him to pay the mandatory victim penalty assessment. We hold that the jury was properly instructed and discern no error in the trial court's declining to recess or imposing the victim penalty assessment. We also hold that none of the issues that Williams raises in his statement of additional grounds for review (SAGR) warrants reversal. Therefore, we affirm.

<u>FACTS</u>

In August 2019, the State charged Williams by information with felony hit and run following a February 2019 collision that resulted in a bicyclist's death. Williams pleaded not guilty, and the charge was tried to a jury over five days in late August and early September 2021.

At trial, witness Tyrel Charles testified that he, Kenoshay Rouse, Kayla Martinka, and an infant, were in Williams's white Chevrolet four-door on February 25, 2019, when they were involved in a collision. Charles testified that he, Martinka, and the infant, were in the back seat, Rouse was in the front passenger seat, and Williams was driving. Charles recalled that the group was traveling on Rainier Avenue South when "the car in front of us all of a sudden slammed on their brakes, so [Williams] moved over and then by the time we got side by side . . . that's when the dude on the bike came out." Charles testified that there was "a loud bang" and the windshield broke. Charles could not remember the cross street, but recalled "it was by the Safeway."

Charles testified that after hitting the bicyclist, Williams "continued driving straight and . . . came to a stop around the corner," and after "a brief like two minutes," began driving again. He testified that Williams stopped at multiple friends' houses "trying to find somewhere to leave the car." Charles recalled that "someone [Williams] knew" picked up Charles, Rouse, Martinka, and the infant, and took them home, but he could not remember if Williams "stayed or if he left." He also recalled that Williams left his car in "a field."

Martinka, who also testified, recalled that on February 25, 2019, the group was in a white car, with Williams driving, when they were involved in a collision. When asked "how the car accident happened, involving the bicyclist," Martinka responded, "We were driving in the left lane and the car immediately in front of us came to a complete stop and to avoid an accident, [Williams] merged to the right. And as soon as he merged to the right, it was right there." When asked whether there was any damage to the car, Martinka responded that "[t]here was some glass." She testified that after the accident,

Williams "stop[ped] some ways right up above" but did not get out of the car and eventually kept going. Martinka testified that Williams left the car "somewhere outside" and then went with the group to Martinka's house, where he stayed for "a couple of days."

A paramedic who responded to the collision testified that the bicyclist was pronounced dead at the scene. And, a medical examiner testified that the collision caused the bicyclist's death.

Multiple law enforcement officers who responded to or investigated the collision also testified at Williams's trial. Officer Quinton Cooper testified that although he initially went to the scene, he left because he "received . . . additional information from . . . Renton PD that they had located a possible suspect vehicle." Officer Mitchell Schaefer similarly testified that "[d]ispatch . . . advised that someone had called in and explained they found a vehicle" matching the description of the car involved in the collision. Schaefer, who then went to the vehicle's location, testified that it was "up a long residential street in Renton, kind of tucked away on a little green space" and that it "had a lot of extensive front end damage and some blood over the front end of the vehicle and the glass." The citizen who reported the car to law enforcement later described it as a Chevrolet sedan.

The jury also heard testimony from Detective Thomas Bacon. Bacon's testimony began on the second day of trial. That day, Bacon authenticated two 911 calls from the underlying incident, and they were played for the jury. In one call, the caller stated, "I just witnessed a person on a bike—he just got hit by the car and the car is fleeing." The caller indicated that the car "was a white car . . . like an old like Chevrolet type of

four-door." When asked about the location, the caller responded, "It's . . . across the street from Rainier Beach Safeway."

After the 911 calls were played, Bacon described the scene of the collision, including by describing several photographs he took at the scene and discussing his initial impressions. Bacon also described reviewing photographs of the Chevrolet that was found in Renton. He testified that "the big thing that really caught [his] attention" was that "it looks just like the damage you'd expect to see in a vehicle that impacts a pedestrian or a bicyclist." He also testified, "You know, people drive around with damaged windshields all the time; people rarely ever drive around with a vehicle that badly damaged. It appeared to me that . . . more than likely, it had just happened." Bacon testified that after viewing a video of the collision that he had obtained from a nearby business, he "felt overwhelmingly . . . it was the same car." The video was then admitted into evidence and played for the jury. The video shows a white sedan striking a bicyclist and continuing away from the scene. After the video concluded, the case adjourned for the day.

Bacon testified again the next day, which was a Thursday and the third day of trial. During his morning testimony, Bacon described the location where the white Chevrolet was recovered. He then testified that the vehicle was impounded, and that he used the vehicle's license plate number and vehicle identification number to run a records check with the Department of Licensing. Bacon testified that the records check revealed that the vehicle had been sold in December 2018 to Williams, and during Bacon's testimony, the trial court admitted a document identifying Williams as the owner of the vehicle. Bacon then testified about his unsuccessful efforts to obtain additional

video footage, his visit to the location where the Chevrolet was abandoned to take additional photographs, and his search of the Chevrolet for additional evidence, including fingerprints. After the court admitted some photographs of the Chevrolet and some diagrams that Bacon created of the damage to the bicycle, the court took a morning recess. At that point, the prosecutor indicated that "Juror 5" "was dozing off and possibly sleeping in some portions of the testimony," and the court stated that it would "start taking stretch breaks every 30 minutes" and "keep an eye on him."

When the court reconvened, Bacon described several photographs showing the damage to the Chevrolet, then described the damage to the victim's bicycle. He described his reconstruction of the collision, including how he reached an estimate "that the vehicle was traveling somewhere between 34 and 37 mph at the time of impact." He testified that he "never found any information or any indication that anybody ever contacted us about this collision, as far as being responsible or being the owner of that vehicle." Bacon then began describing how to interpret certain cell phone records, which the State offered for admission. Defense counsel objected and indicated that "this might be a good time to recess." The trial court then announced a lunch break but asked Juror 5 to stay behind.

After the rest of the jury exited, the trial court explained to Juror 5, "The reason I held you back was because we've noticed that you've had some trouble staying awake during testimony." The court asked Juror 5, "[W]ould it be helpful to you to have the afternoon to take a nap? Or is there something that we could do to make it easier for you to be able to stay awake during the testimony?" Juror 5 responded that he had been up until 1:00 a.m. but that he did not need a nap and, "Once I have some food in

me, I'll be fine." After Juror 5 left the courtroom, defense counsel stated for the record, "Juror No. 5, I noticed he was falling asleep. He fell asleep at least three times while I observed it." The trial court indicated that it did "see him drifting off" and asked "for everyone to keep an eye on it and keep me updated if they see something that I don't."

When court reconvened after the lunch recess, defense counsel stated, "Your Honor, in discussing this matter with my Client, we have some very, very major concerns regarding Juror No. 5 in the fact that he has nodded off several times this morning." He observed that there were no alternate jurors remaining and asked the trial court to recess until Monday. The court declined to do so but brought Juror 5 in before the remaining jurors, and asked, "Hi. Wondering how you're feeling at this point?" Juror 5 responded that he had had some coffee, and when asked whether the court should recess to allow him "to take a break and get some sleep," Juror 5 responded, "No, no. . . . it's just not necessary."

Bacon then resumed testifying. During Bacon's afternoon testimony, the trial court admitted a recording of Bacon's interview with Williams, which was played for the jury. During the interview, Williams denied being involved in a collision on February 25, 2019, and told Bacon that his car had been stolen two or three days earlier. After the interview was played, the trial court excused the jury for an afternoon break, and the following colloquy took place:

> THE COURT: Anything we need to discuss before breaking?
> [PROSECUTOR]: Not from the State.
> [DEFENSE COUNSEL]: I'm still watching Juror No. 5, Your Honor.
> THE COURT: I've been watching Juror No. 5. I haven't seen him sleeping, have you?
> [DEFENSE COUNSEL]: I saw his eyes flittering.
> THE COURT: Okay (laughs).
> [DEFENSE COUNSEL]: It's kind of difficult because he'll look

down and it looks like he's—
      THE COURT:  Yes.
      [DEFENSE COUNSEL]:  You know, from my position—that's why I haven't emailed you.
      THE COURT:  Yes, okay.  I'm keeping an eye on him.  All right.  Thank you.

The foregoing colloquy is the final reference in the record to Juror 5's inattentiveness.

After the State rested its case, Williams brought a motion to dismiss, arguing that one of the elements of felony hit and run is the driver's knowledge not only of a collision, but also that the collision resulted in death.  Williams asserted that dismissal was required because "the State has failed to prove that Mr. Williams was aware that a death occurred in the accident."  The trial court denied Williams's motion, reasoning, "The charge is while driving a motor vehicle, [Williams] was knowingly involved in an accident resulting in the death of another person," and "the [']knowingly involved in['] is the modifier for an accident, not the death."  Consistent with this ruling, the trial court's to-convict instruction read, in relevant part:

> To convict the defendant of the crime of hit and run, each of the following elements of the crime must be proved beyond a reasonable doubt:
> (1) That on or about February 25, 2019, the defendant was the driver of a vehicle;
> (2) That the defendant's vehicle was involved in an accident resulting in the death of any person;
> (3) That the defendant knew that he had been involved in an accident
> (4) That the defendant failed to satisfy his obligation to fulfill all of the following duties:
> (a) Immediately stop the vehicle at the scene of the accident or as close thereto as possible;
> (b) Immediately return to and remain at the scene of the accident until all duties are fulfilled;
> (c) Give his name, address, insurance company, insurance policy number, and a vehicle license number, and exhibit his driver's license, to any person struck or injured; and
> (d) Render to any person injured in the accident reasonable assistance, including carrying or making of arrangements for the carrying of such person to a physician or hospital for medical treatment if it is apparent that

such treatment is necessary or such carrying is requested by the injured person or on his behalf; and
(5) That any of these acts occurred in the State of Washington.

The jury found Williams guilty as charged. At sentencing, the trial court waived all discretionary legal financial obligations and imposed only the mandatory, $500.00 victim penalty assessment.

Williams appeals.

## ANALYSIS

### A. To-Convict Instruction

Williams contends that reversal is required because the to-convict instruction omitted an essential element of the charged crime. Specifically, he renews his argument that the hit and run statute, RCW 46.52.020, requires the State to prove that the defendant had knowledge not only of the collision but also of the resultant injury or death. The State counters that Williams's argument is foreclosed by State v. Vela, 100 Wn.2d 636, 673 P.2d 185 (1983). We agree with the State.

"Because it 'serves as a yardstick by which the jury measures the evidence to determine guilt or innocence,' a to-convict instruction must contain all essential elements of the charged crime." State v. Gonzalez, 2 Wn. App. 2d 96, 105, 408 P.3d 743 (2018) (internal quotation marks omitted) (quoting State v. DeRyke, 149 Wn.2d 906, 910, 73 P.3d 1000 (2003)). We review the adequacy of a to-convict instruction de novo. Gonzalez, 2 Wn. App. 2d at 105.

The hit and run statute imposes upon "[a] driver of any vehicle involved in an accident resulting in the injury to or death of any person" a duty to "immediately stop such vehicle at the scene of such accident or as close thereto as possible" and to

"forthwith return to, and in every event remain at, the scene of such accident until he or she has fulfilled the requirements of [RCW 46.52.020(3)]." RCW 46.52.020(1). Those requirements include "render[ing] to any person injured in such accident reasonable assistance." RCW 46.52.020(3). In Vela, our Supreme Court held, unequivocally, that the hit and run statute "cannot be construed to require knowledge of injuries," and "[k]nowledge of the accident is all the knowledge that the law requires." 100 Wn.2d at 641 (emphasis added). "If a motorist knows he has been involved in an accident and fails to stop, he is guilty of violating RCW 46.52.020." Vela, 100 Wn.2d at 641.

Vela binds this court. See State v. Gore, 101 Wn.2d 481, 487, 681 P.2d 227 (1984) (Supreme Court's decision on issue of state law binds all lower courts until that court reconsiders). Thus, Williams's contention that knowledge of injury or death is an essential element of felony hit and run fails. And so, too, does Williams's assertion that the to-convict instruction erroneously omitted this element.

Williams disagrees and argues, relying chiefly on State v. Blake, 197 Wn.2d 170, 481 P.3d 521 (2021), that Vela's interpretation of the hit and run statute does not comport with due process.

In Blake, our Supreme Court held that Washington's felony drug possession statute was unconstitutional "because it criminalize[d] wholly innocent and passive nonconduct on a strict liability basis" "with no mens rea or guilty mind" and, thus, was not a valid exercise of the legislature's police power. 197 Wn.2d at 182-83, 193. By contrast, the hit and run statute as interpreted in Vela includes a mens rea element— knowledge—and criminalizes a person's leaving the scene of a known accident without stopping to investigate or render assistance—conduct that is neither passive, wholly

innocent,[1] nor beyond the reach of the legislature's broad police power. Cf. State v. City of Seattle, 94 Wn.2d 162, 165, 615 P.2d 461 (1980) ("The scope of police power is broad, encompassing all those measures which bear a reasonable and substantial relation to promotion of the general welfare of the people."); Vela, 100 Wn.2d at 641 (observing that the hit and run statute "requires the motorist to stop and investigate" and that the "public interest . . . is served by requiring persons involved in vehicle collisions to stop and provide identification and other personal information and to be available to render assistance if required"). Williams's reliance on Blake is misplaced. Cf. State v. Moreno, 198 Wn.2d 737, 743, 499 P.3d 198 (2021) (observing that the court's primary concern is "adding mens rea elements to strict liability criminal statutes that otherwise would have no mental state" (emphasis added)).

Williams also cites Rehaif v. United States, ___ U.S. ___, 139 S. Ct. 2191, 204 L. Ed. 2d 594 (2019), for the proposition that "[a] crime requires proof of a culpable mental state regarding each of the statutory elements." (Internal quotation marks omitted.) Williams mischaracterizes Rehaif.

---

[1] In support of his assertion that the hit and run statute punishes innocent conduct, Williams points out that another statute, RCW 46.52.010, sets forth a more limited set of duties for a motorist who collides with an unattended vehicle. He then speculates that a hypothetical motorist who "backs into a car and, believing it to be unoccupied, leaves a note with their name and address" and, thus, "think[s] they have satisfied their duty under RCW 46.52.010(1)," could later be convicted of a felony if, "unbeknownst to them someone was sleeping in the car" and was injured. Williams argues, citing Blake, that "[t]his violates due process." But there is a difference between a statute (like the one at issue in Blake) that is wholly invalid because the legislature enacted it to criminalize innocent nonconduct, and a statute that violates due process as applied to a particular set of facts. Nothing in Blake suggests that a statute is invalid just because it may be unconstitutional as applied to a particular defendant. Cf. Didlake v. Washington State, 186 Wn. App. 417, 423, 345 P.3d 43 (2015) (distinguishing facial challenges from as-applied challenges to the constitutionality of a statute). Furthermore, the facts of Williams's hypothetical are not before this court. For the foregoing reasons, we need not and do not consider Williams's hypothetical. Cf. State v. McCarter, 91 Wn.2d 249, 253, 588 P.2d 745 (1978) ("One cannot urge the invalidity of a statute unless harmed by the particular feature which is challenged."), overruled on other grounds by In re Det. of McLaughlin, 100 Wn.2d 832, 676 P.2d 444 (1984); Flory v. Dep't of Motor Vehicles, 84 Wn.2d 568, 572, 527 P.2d 1318 (1974) ("The judicial function . . . does not generally encompass rendering advisory opinions nor speculate upon how some other controversy would be resolved.").

In Rehaif, the Court, in construing a federal criminal statute, applied "a . . . presumption . . . that Congress intends to require a defendant to possess a culpable mental state regarding 'each of the statutory elements that criminalize otherwise innocent conduct.'" 139 S. Ct. at 2195 (emphasis added) (quoting United States v. X-Citement Video, Inc., 513 U.S. 64, 72, 115 S. Ct. 464, 130 L. Ed. 2d 372 (1994)). The Court did so after "find[ing] no convincing reason to depart from the ordinary presumption" and observing that, without an additional scienter element, the statute at issue would criminalize the "entirely innocent" conduct of possessing a gun. Rehaif, 139 S. Ct. at 2195, 2197. Here, as discussed, the hit and run statute as interpreted in Vela does not criminalize entirely innocent conduct. And while the State does not point it out, there is a convincing reason not to apply the presumption described in Rehaif in determining our state legislature's intent with regard to the hit and run statute: Vela held, unequivocally, that the hit and run statute "cannot be construed to require knowledge of injuries." Vela, 100 Wn.2d at 641. Yet the legislature has not added such a knowledge requirement to the statute despite having amended it four times since Vela was decided in 1983. See LAWS OF 1990, ch. 210, § 2; LAWS OF 2000, ch. 66, § 1; LAWS OF 2001, ch. 145, § 1; LAWS OF 2022, ch. 194, § 1.[2] Under these circumstances, there exists a competing, arguably stronger, presumption that the legislature has acquiesced to Vela's interpretation of the statute. See Blake, 197 Wn.2d

---

[2] Williams observes that in one of these amendments, the legislature increased a hit and run resulting in death from a class C felony to a class B felony. See LAWS OF 2000, ch. 66, § 1. He asserts that "[t]he increase in punishment must be accompanied by a higher degree of culpability." But he cites no authority to support this assertion, so we reject it. Cf. Vela, 100 Wn.2d at 640 (rejecting argument that "[a] more serious penalty should be imposed only if the defendant's mental state makes her more culpable"); State v. Brown, 140 Wn.2d 456, 466, 998 P.2d 321 (2000) (rejecting argument that, to prove third degree assault under statute elevating assault from fourth to third degree if victim is a law enforcement officer, the State must prove that defendant knew the victim was a law enforcement officer).

at 191 (the legislature acquiesced to judicial interpretation of the simple possession statute as lacking any mens rea element where it subsequently amended it multiple times without adding one).

In short, Rehaif does not, as Williams claims, support the proposition that a crime requires proof of a culpable mental state regarding each statutory element. Instead, the Rehaif court merely applied an interpretive presumption under circumstances that are readily distinguishable from the circumstances here. Rehaif does not control.

B. Juror 5

Williams next contends that the trial court erred in declining to recess for the weekend to allow Juror 5 to sleep. We disagree.

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee a criminal defendant the right to a fair trial by an impartial jury. State v. Gaines, 194 Wn. App. 892, 896, 380 P.3d 540 (2016). "A sleeping juror may prejudice the defendant's due process rights and right to an impartial jury." In re Pers. Restraint of Caldellis, 187 Wn.2d 127, 146, 385 P.3d 135 (2016).

However, a defendant seeking reversal based on a sleeping juror must establish prejudice. See State v. Hughes, 106 Wn.2d 176, 204, 721 P.2d 902 (1986) (dismissing claim about drowsy jurors because "[n]othing suggest[ed] that the jury drowsiness problem was such as to prejudice the defendant"). The defendant must generally show "how long the jurors slept or what specific testimony they missed by sleeping." Caldellis, 187 Wn.2d at 146.

Here, Williams asserts he was prejudiced because Juror 5 "continued to fall asleep in the afternoon" on the third day of trial and, thus, "slept during critical testimony

by Detective Bacon." Williams avers, specifically, that "Juror # 5 missed critical evidence that supported Mr. Williams's innocence"—namely, the telephone interview during which Williams denied being involved in an accident and told Bacon that his car had been stolen.

Williams mischaracterizes the record. During the colloquy that occurred after the interview was played, the trial court indicated that it had been watching Juror 5 and "ha[d]n't seen him sleeping." While defense counsel noted that he saw Juror 5's "eyes flittering," defense counsel did not disagree with the trial court's assessment. To the contrary, and despite the trial court's earlier direction that the parties "keep [it] updated" if they saw something the trial court did not, defense counsel indicated that he had decided against e-mailing the trial court for reasons that are not apparent from the record. The record does not support Williams's assertion that Juror 5 "continued to fall asleep in the afternoon" and "missed" the telephone interview that was played during Bacon's afternoon testimony.

Furthermore, to the extent Juror 5 was asleep during Bacon's testimony from the morning of the third day of trial, that testimony focused largely on the recovery and impound of the suspect vehicle, Bacon's learning that the vehicle had been sold to Williams in December 2018, and Bacon's search of the vehicle for additional evidence. Williams does not specify what part of this testimony Juror 5 missed, much less establish resulting prejudice.

Williams fails to show that the trial court abused its discretion in declining to recess. See Hughes, 106 Wn.2d at 204 ("The determination as to whether the jury was so inattentive that the defendant was prejudiced is [a] matter addressed to the trial

court's discretion, and is reviewable only for abuse."). Moreover, there is overwhelming evidence in the record that Williams was driving during the collision, that the damage to his vehicle was significant such that Williams would have known that a collision had occurred, and that he did not return to or remain at the scene. Reversal is not required.

C. Victim Penalty Assessment

Williams contends that because he is indigent, the trial court violated the constitutional prohibition on excessive fines when it ordered him to pay the mandatory, $500.00 victim penalty assessment (VPA). See RCW 7.68.035(1)(a) (requiring imposition of the VPA on "any person . . . found guilty in any superior court of having committed a crime" subject to exceptions not applicable here). But as we explained in State v. Tatum, 23 Wn. App. 2d 123, 130, 514 P.3d 763 (2022), we are bound by State v. Curry, 118 Wn.2d 911, 829 P.2d 166 (1992), in which our Supreme Court held that the VPA is constitutional as applied to indigent defendants. See Curry, 118 Wn.2d at 918 ("[W]e hold that the [VPA] is neither unconstitutional on its face nor as applied to indigent defendants."). Williams correctly observes, as we did in Tatum, 23 Wn. App. 2 at 130, that Curry's reasoning was vague. But we adhere to Tatum and hold that Curry nonetheless forecloses Williams's constitutional challenge to the VPA.

D. Statement of Additional Grounds for Review

Williams raises a number of additional issues in a SAGR, but none requires reversal.

First, Williams asks, "Why is it ok for [Charles] to commit perjury and rec[ei]ve no criminal charges?" Similarly, Williams asks with regard to Martinka, "Any form of perjury is perjury, why would it be ok for [Martinka] to commit perjury on the stand [and] the

-14-

[S]tate be ok with it[?]" In other words, Williams asserts that Charles and Martinka lied on the stand, and he points to evidence that he claims undermined their testimony. But it is the function and province of the jury, not this court, to weigh the evidence, determine the credibility of the witnesses, and to decide disputed questions of fact. Hughes, 106 Wn.2d at 203-04. Williams's assertion invites this court to reweigh the evidence and, thus, is without merit. See State v. Bunch, 2 Wn. App. 189, 467 P.2d 212 (1970) ("As an appellate court, . . . we cannot weigh the evidence or re-evaluate the credibility of witnesses.").

Second, Williams contends that "Juror # 24 tainted the jury pool by mentioning he heard about me in the news and what he has read in the newspaper." To this end, the record reflects that during voir dire, Juror 24 stated, "I probably have more prejudice against the Defendant than not because I remember reading about—not so much the hit and run, but . . . what this gentleman was accused of doing later in a road rage incident. And I don't know whether I can get past that." Juror 24 was then excused for cause after confirming that he had already reached an opinion in the case and would not be able to set it aside. Williams asserts that reversal is required because the other jurors in the same pool as Juror 24 "could have formed a negative opinion about [Williams] and refrained from telling the court about any potential prejudice they may have formed." Williams also asks, "Of the Jury that was selected to sit and hear the trial, did they listen to the court [and] not research my case, or look me up, or even converse with someone about me that could have potentially did so[?]"

But "[w]e presume that juries follow the instructions and consider only evidence that is properly before them." State v. Perez-Valdez, 172 Wn.2d 808, 818-19, 265 P.3d

-15-

853 (2011). Here, the trial court instructed the venire not to discuss the case with anyone or "do any research online or elsewhere about any aspect of it." The jury was also instructed of its "duty to decide the facts in this case based upon the evidence presented to you during this trial" and that it "must reach [its] decision based on the facts proved to [it] and on the law given to [it], not on sympathy, prejudice, or personal preference." Williams's speculations that other potential jurors "could have formed a negative opinion" or researched Williams's case are insufficient to overcome the presumption that the jury did as instructed.

Finally, Williams asserts that Detective Bacon was biased because "he solely based his investigation on [Williams and] no one else" and "[w]ith all the information he rec[ei]ved [throughout] this investigation in his mind [Williams] was the only one charged." But Williams does not specify what "information" Bacon received that should have prompted him to focus his investigation elsewhere, and "the appellate court is not obligated to search the record in support of claims made in a [SAGR]." RAP 10.10(c). In any case, regardless of the thoroughness of Bacon's investigation, Williams does not argue—much less establish—that the investigation failed to produce sufficient evidence to sustain the jury's verdict. Cf. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992) ("The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt.").

Affirmed.

_Mann, J._

WE CONCUR:

_Díaz, J._                    _Chung, J._